Filed 4/11/14 opinion on transfer from Supreme Court
**See Concurring Opinion**

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E049095 |
| v. | (Super.Ct.No. FVI802610) |
| FRED EDWARD ARCHULETA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr. and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Julie L. Garland, Assistant

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

1

Attorneys General, and Peter Quon, Jr., Angela Borzachillo, and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Fred Edward Archuleta guilty as charged of possessing a controlled substance, methamphetamine, and active gang participation. (Health & Saf. Code, § 11377, subd. (a); Pen. Code, § 186.22, subd. (a).)[1] Defendant was arrested on December 5, 2008, after law enforcement officers found him in his garage in possession of methamphetamine and in the company of a gang member who admitted he was selling methamphetamine. At trial, the prosecution's gang expert testified defendant was a high-ranking member of and an active participant in the East Side Victoria (ESV) criminal street gang at the time of his arrest, and had been for a long time. The expert based his opinion in part on the testimonial hearsay statement of another ESV gang member, Fernando Perez. According to the expert, Perez "told investigators" that defendant directed the November 2008 robbery of a Victorville drug dealer by Perez and other ESV gang members. Perez apparently made the statement during a custodial police interrogation following his arrest for the November 2008 robbery and the provocative act murder of an ESV gang member who was shot and killed during the robbery. Defendant was not charged for the robbery or the murder.

In a 2011 decision in this case (*People v. Archuleta* (Dec. 29, 2011, E049095) [nonpub. opn.]) (*Archuleta I*), we rejected defendant's claim that the admission of Perez's testimonial hearsay statement as basis evidence to support the gang expert's opinion

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

violated defendant's Sixth Amendment confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). We followed a series of decisions by this and other appellate courts that the admission of out-of-court hearsay statements as basis evidence to support an expert's opinion against a criminal defendant at trial does not violate the confrontation clause because the statements are not offered for their truth; they are offered for the distinct and permissible purpose of supporting the expert's opinion. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*) [Fourth Dist., Div. Two]; *People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747 (*Cooper*); *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427 (*Ramirez*); *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154 (*Sisneros*).)

Defendant petitioned the state Supreme Court for review of *Archuleta I*, review was granted and deferred, and the matter was transferred to this court with directions to vacate our decision in *Archuleta I* and reconsider the cause in light of *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221] (*Williams*), *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). (Cal. Rules of Court, rules 8.512(d)(2), 8.528(d).) Nothing in any of these decisions affects our conclusion in *Archuleta I* that Perez's out-of court statement that defendant directed the November 2008 robbery—made to investigators during a custodial interrogation—was testimonial "under any conceivable definition." (*Crawford, supra,* 541 U.S. at pp. 51-52, 54, fn. 4.)

But five of the nine United States Supreme Court justices in *Williams* and six of the seven state Supreme Court justices in *Dungo* agreed that out-of-court testimonial statements—even when offered solely as basis evidence to support an expert's opinion and not, purportedly, as substantive evidence of their truth—may nonetheless be offered for their truth and violate the confrontation clause. (*Williams, supra,* 132 S.Ct. at pp. 2255-2264 (conc. opn. of Thomas, J.); *id.* at pp. 2264-2277 (dis. opn. of Kagan, J., joined by Scalia, J., Ginsburg, J., and Sotomayor, J.); *Dungo, supra*, 55 Cal.4th at pp. 621-627 (con. opn. of Werdegar, J., joined by Cantil-Sakauye, C.J., Baxter, J., and Chin, J.); *id.* at pp. 633-649 (dis. opn. of Corrigan, J., joined by Liu, J.).) We believe that if either high court were to consider defendant's confrontation claim today, a majority of the justices of each court would agree that Perez's statement was effectively offered for its truth through the testimony of the gang expert and violated defendant's Sixth Amendment right to confront and cross-examine Perez. The prosecution did not show that Perez was unavailable or that defendant had a prior opportunity to cross-examine him. (*Crawford, supra,* 541 U.S. at p. 59.) We therefore conclude that the use or admission of the statement violated *Crawford*.

As we further explain, however, the federal constitutional error was harmless beyond a reasonable doubt. The use of Perez's testimonial hearsay statement for its truth, as basis evidence to support the gang expert's opinion, could not have affected the verdict on the methamphetamine possession or the active gang participation charge. In the

4

nonpublished portion of this opinion, we explain why defendant's other claims of error are without merit. We therefore affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

A. *The Circumstances of the Charged Offenses*

Around 1:00 a.m. on December 5, 2008, San Bernardino County Sheriff's Deputy Brian Roper and several other officers, including Detective Garth Goodell, a member of the department's high desert regional gang team, went to defendant's residence in Victorville looking for George Espinosa, a homicide suspect known as "Little Sleepy." Around one week earlier, Deputy Roper received information from Natividad Ramirez that Espinosa could be at defendant's residence.

After the deputies arrived at defendant's residence, Detective Goodell stood next to the garage while Deputy Roper and another detective went to the front door. The garage door opened, and defendant and Ramirez were in the garage. Defendant was using a cellular telephone, and Ramirez dropped a bag of suspected methamphetamine on the garage floor. Espinosa was not found at the residence.

Deputy Roper searched Ramirez and found a plastic scale and a bag of suspected methamphetamine in his pockets. Detective Goodell searched defendant and found $100 cash in his left pants pocket and a bag of suspected methamphetamine wrapped around his right belt loop and tucked into his coin pocket. A vehicle parked in front of the residence had recently been reported stolen.

5

Detective Goodell collected the $100 cash, cellular telephone, plastic scale, and the two suspected bags of methamphetamine found on defendant and Ramirez, together with the third suspected bag Ramirez dropped. The detective also found a fourth "empty" bag on the garage floor that appeared to contain methamphetamine residue, but he did not believe it had any evidentiary value and threw it away. Defendant was placed under arrest, but Ramirez was allowed to leave.

The three suspected bags of methamphetamine were later tested and determined to contain 2.92, 0.40, and 0.27 grams, respectively, of methamphetamine. Apparently, the bag containing the smallest amount of methamphetamine was the bag found on defendant.

Ramirez and defendant were originally charged in the same two-count information with simple possession of methamphetamine and active gang participation. During jury selection at their joint trial, Ramirez pled guilty to both charges and admitted a prior strike conviction and four prison priors. He was later sentenced to five years four months in prison.

B. *Expert Gang Testimony*

San Bernardino County Sheriff's Deputy Josh Conley testified as a gang expert for the prosecution. At the time of trial in May 2009, Deputy Conley had been a deputy sheriff for over seven years, first in Los Angeles County and later in San Bernardino County. He was trained in gang investigations and identifications, and had attended two "jail operations courses," which included additional instruction in gang "investigation,

6

trends, identification . . . ." He later attended an "advanced gang awareness course" and received "more informal" training in gang investigation, identification, tattoos, trends, activity, and prosecution while working in the West Valley Detention Center (the WVDC) in Rancho Cucamonga.

Deputy Conley had experienced many personal contacts with gang members while working in jails in Los Angeles and San Bernardino Counties. Before July 2005, he worked in the WVDC's high security unit, which housed the "most violent and most reputed" gang members in San Bernardino County. He recalled that defendant was housed in the WVDC's high security unit some time before July 2005 when the deputy was working in the WVDC.

In July 2005, Deputy Conley was assigned to the Victorville sheriff's station. After completing a field training program and working on patrol for two years, he was assigned to the station's gang enforcement detail. In that capacity, he performed parole compliance checks and contacted parole agents and gang members at parole offices. During the course of his seven-year career, he had spoken with over 1,000 gang members and had documented over 300 gang members.

Eight criteria were used to "document" or identify a person as a gang member on a gang identification card: (1) the gang member's "self-admission"; (2) "classification admit" (the gang member's admission of his gang membership during a booking interview); (3) gang tattoos; (4) gang signs; (5) gang apparel; (6) "reliable source," for example, a confidential informant identifying the person as a gang member; (7) prison

7

documentation; and (8) intercepting mail in a custodial facility with gang-related writing. At least two criteria were required to document a person as a gang member, with the exception of "classification admit" which was alone sufficient.

Not all gang members wear "gang specific" tattoos identifying their gang. The deputy had encountered persons who had been gang members for decades who did not have tattoos identifying their "higher status" in the gang. It had recently become common for gang members not to get gang-related tattoos in order to prevent law enforcement officers from easily identifying them as gang members. The deputy kept currently informed on gangs and their activities through speaking with other investigators, professional associations, and "validation packets" prepared by the California Department of Corrections and Rehabilitation (CDCR) which documented persons as gang members.

Through his work at the Victorville station, Deputy Conley was familiar with a criminal street gang known as "East Side Victoria." The gang had approximately 150 documented members and 50 associates, and generally claimed the east side of Victorville as its turf. The deputy had personally contacted between 40 and 50 ESV gang members. Various signs and symbols were associated with the gang, including "ESV," "VCG," "EVG," and "ESVR." The gang's principal activities included murder, attempted murder, assault with a deadly weapon, and drug sales. Between May 2006 and 2008, three of its documented members had committed felony "predicate offenses" listed in the California Street Terrorism Enforcement and Prevention Act. (§ 186.20 et seq.)

8

Since 2007, an injunction had been in effect prohibiting ESV members from associating with each other in the area claimed by the gang, which was known as the "safety zone." Gang members were subject to arrest for violating the injunction.

As a southern Hispanic gang, ESV was affiliated with and subordinate to the Mexican Mafia in the state prison system. The Mexican Mafia is a prison gang that controls all southern Hispanic gangs under the "Sureno umbrella." In gang parlance, the Mexican Mafia "calls down the shots" or directs the criminal activities of its subordinate gang members who act as its "foot soldiers." Subordinate gangs are required to "funnel up taxes" or pay a portion of the proceeds of their criminal activities to the Mexican Mafia, including drug sales, to remain in good standing. The failure to pay taxes could result in a gang member or an entire neighborhood being "green lighted" or targeted for retaliation.

Particular symbols indicate that a southern Hispanic gang is affiliated with the Mexican Mafia. These include the acronym SUR, the number 13, La Eme, and a kanpol symbol, which is two lines and three dots signifying the Mayan number 13. The acronym SUR stands for Southern United Raza, and "big homie" is a term normally used to denote a Mexican Mafia member.

A person can become a member of a southern Hispanic criminal street gang mainly in three ways: by "criming in" or putting in work for the gang, by being "jumped in" or beaten for 13 seconds, or by being "walked in," which is usually reserved for members with older siblings in the gang. "Shot callers" for the gangs are usually over 30

9

years old and are looked up to as leaders by younger members. A person can also be "jumped out" or "crimed out" of a southern Hispanic gang just as they can be jumped in or crimed in. A member can also ask an older gang member or "veterano" to be allowed out of the gang. Mexican Mafia membership, by contrast, is "blood in, blood out." In order to gain membership in the Mexican Mafia, a person has to "spill blood" or commit a violent assault, and the only way out of the Mexican Mafia is by death.

At the time of trial in May 2009, Deputy Conley was assigned to the Adelanto Detention Center (the ADC) in Adelanto where Ramirez was in custody. The deputy had personally completed a gang identification card documenting Ramirez as an ESV gang member. He told Ramirez he was documenting him as an ESV member, and Ramirez did not object or correct him. Ramirez had ESV and Mexican Mafia-related gang tattoos, including "ESV," "SUR", "X3," and "3CE."

Deputy Conley became involved in the investigation of the present case after he searched Ramirez's property at the ADC and found a letter that defendant had written to Ramirez. In the letter, defendant discussed the charges against himself and Ramirez and wrote: "Just be sure that you don't agree to anything without us agreeing on it, because the charges are . . . real . . . petty."

Deputy Conley was familiar with defendant through his training, through speaking with other gang investigators, and through reviewing "documentation from CDC[R] and prior gang cards." A "validation packet" from the CDCR "validated" or identified defendant as a Mexican Mafia associate at the beginning of 1989. The deputy explained

that the CDCR's "validation process" of labeling someone a gang member is a lengthy process that involves checking several sources of documentation or other proof. In addition, a 1993 gang identification card documented defendant as a member of the ESV.

A September 2004 "classification sheet" identified defendant as a member of "Vario Victoria Rifa," a clique of ESV, and indicated he was being housed in the high security unit. Defendant signed the 2004 classification sheet acknowledging his gang status. The document was placed on an overhead projector and published to the jury. Deputy Conley was familiar with an offense defendant committed on September 1, 2004, namely, attempted possession of a firearm by a felon. (§ 664; former § 12021 [repealed eff. Jan. 1, 2012, and reenacted as § 29800, subd. (a)(1) without substantive change].) The court took judicial notice of a court file concerning the offense.

A second classification sheet dated December 5, 2008, the date defendant was arrested on the current charges, indicated he was a member of the Vario Victoria Rifa and the Mexican Mafia. Defendant signed the 2008 classification sheet, "self admitting" its contents. The notation "red suit" was marked on the 2008 classification sheet, indicating defendant was "high security." The 2008 classification sheet was also published to the jury.

Deputy Conley opined defendant was an "active" member of ESV at the time of trial and had been for a long time. Defendant was also a "shot caller" for the gang. Deputy Conley based this opinion on his contacts with defendant, his subsequent conversations with other gang members, including Ramirez, and with gang investigators,

11

including Detective Goodell and Deputy Roper, on defendant's CDCR validation file, the 1993 gang identification card, and on the 2004 and 2008 gang classification sheets. Defendant was also an associate of the Mexican Mafia and enjoyed a high level of "influence and status" which allowed him to direct the activities of southern Hispanic gang members.[2]

Defendant expressed his high-level status in ESV by directing the activities of other gang members. As an example that defendant directed the activities of other gang members, Deputy Conley pointed to defendant's April 2009 letter to Ramirez, telling him not to enter into a plea bargain unless defendant also agreed. According to the deputy, the letter indicated that defendant exercised "a certain amount of influence" over Ramirez and other members of ESV.[3]

As another example of defendant directing the activities of other gang members, Deputy Conley explained that, in November 2008, around one month before defendant's December 5, 2008, arrest on the current charges, three ESV gang members, namely, George Espinosa (Little Sleepy), Fernando Perez (Bam-Bam), and Joseph Delonie (Little Goofy) committed a residential robbery in downtown Victorville. The robbery was a "taxation" of a drug dealer who was dealing drugs in the old town area of Victorville, an

---

[2] On cross-examination, Deputy Conley clarified that although defendant was a "shot caller" for ESV and a "validated" Mexican Mafia associate for ESV, he was not a shot caller for the Mexican Mafia.

[3] The court then took judicial notice of its records in which Ramirez "entered a plea as charged [on] May 20th, 2009."

area claimed by ESV. During the robbery, Delonie was shot and killed by the drug dealer, and Perez was shot and wounded. Perez later recovered, and Perez and Espinosa—the homicide suspect the officers were looking for when they went to defendant's home on December 5, 2008—were charged with the murder of Delonie. Over defense objections, Deputy Conley then testified that "Perez gave a statement to investigators stating that [defendant] directed that robbery and taxation."[4]

The prosecutor next asked Deputy Conley whether defendant's possession of methamphetamine on December 5, 2008, was a gang-related activity. The deputy responded that it was in view of the "totality of the circumstances." These included: (1) defendant's "classification admission" of his gang status in jail following his December 5, 2008, arrest, as evidenced by the 2008 classification sheet; (2) defendant's association with Ramirez, another ESV gang member, at defendant's home; (3) the fact defendant's house was in ESV territory and subject to the 2007 injunction; and (4) the fact a stolen car was parked in front of defendant's house at the time defendant and Ramirez possessed

---

[4] Defense counsel objected to the admission of Perez's statement on "multiple levels of hearsay and lack of foundation" grounds. The court overruled these objections. Defendant did not object on confrontation clause grounds or on the ground the statement's irrelevance, unreliability, or potential for prejudice substantially outweighed its probative value as basis evidence under Evidence Code section 352. We consider the confrontation clause claim preserved for review. (*People v. Edwards* (2013) 57 Cal.4th 658, 704 [failure to object on confrontation clause grounds excused when governing law at time of trial afforded scant grounds for the objection].) At the time of trial in 2009, this court's 2005 decision in *Thomas* represented the governing law—that testimonial statements offered solely as basis evidence to support an expert opinion are not offered for their truth and therefore do not violate the confrontation clause. (*Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210.) In light of *Thomas*, defense counsel's failure to object on confrontation grounds was excusable.

the methamphetamine.  The deputy explained that stolen cars are common in gang culture because they can be used for "drive-bys" and other gang-related activity, and can be traded for weapons, drugs, or cash.

The prosecutor next posed a hypothetical question, asking Deputy Conley to assume Ramirez went to defendant's home to sell defendant methamphetamine, and the sale was interrupted by the arrival of law enforcement officers.  When asked how that hypothetical sale of drugs to defendant could have furthered, assisted, or promoted criminal conduct by members of ESV, the deputy responded that sales of drugs, even between gang members, further the gang's criminal activities by generating profits that can be used to buy more drugs, cars, or weapons for the gang, or pay taxes to the Mexican Mafia.

Under cross-examination, Deputy Conley admitted defendant was the first "high ranking" gang member he had ever encountered who did not have gang-related tattoos. He also admitted that a gang member could distance himself from a gang and not commit crimes for the gang for several years while still claiming membership in the gang, but that normally entailed leaving the gang's territory and getting away from other members of the gang.  Deputy Conley had never arrested defendant or any other ESV gang member for violating the 2007 injunction.

Deputy Conley did not complete or sign defendant's 2004 or 2008 classification sheets, and said it would be unethical to change a classification sheet after the inmate

14

signed it. If a change had to be made, he would conduct a "reclassification interview" and complete a new classification sheet for the inmate to sign.

In April 2008, when defendant was in jail, Deputy Conley spoke with defendant and asked him about his status and CDCR validation as a Mexican Mafia associate. Defendant said he had been validated as a Mexican Mafia associate in 1988, and he was a member of "Victoria," not "East Side Victoria." Defendant explained he was around when the gang was formed; it started when members of different families who were associated with the gang were tagging "Victorville South Side." Then someone crossed out South Side and wrote East Side, and eventually East Side "stuck." During the April 2008 contact, the deputy also asked defendant whether he was in good standing with "Victoria" and the Mexican Mafia, and defendant responded, "I'm in good standing until I am not."

Lastly, Deputy Conley testified that, through a process known as "debriefing," a Mexican Mafia associate can "decloak" himself from that classification in the state prison system. The associate is placed in protective custody and must disclose all his past criminal activity on behalf of his gang and everything he knows about his gang's current activities. To the deputy's knowledge, defendant had never "debriefed."

C. *Defense Evidence*

Ramirez and defendant testified for the defense.

1.  <u>Ramirez's Testimony</u>

Ramirez testified that on the night of December 5, 2008, he drove to defendant's house in a white Camry.  He did not know the car had been reported stolen.  He brought some methamphetamine, a scale, and a cellular telephone with him.  He used some of the drug to get "high," and gave some of the drug to defendant.  He believed defendant also got high, but he did not actually see defendant use the drug.  As he was getting high himself, he was not paying attention.

After he was high, Ramirez separated the rest of the methamphetamine into bags and gave defendant a bag containing some "crumbs" of the drug.  He did not see what happened to the bag he gave defendant.  Then "the SMASH officers rolled up," and Ramirez panicked.  He grabbed his bags of methamphetamine and dropped a couple of them as he was going toward the garage door.  Ramirez insisted that the methamphetamine belonged to him and he could not let defendant spend the rest of his life in prison for something he (Ramirez) did.  He did not sell defendant any methamphetamine, though he supported his own methamphetamine habit by selling the drug.

The jury heard that the week before he testified Ramirez pled guilty to possession of methamphetamine and active gang participation.  He had prior felony convictions for negligent discharge of a firearm in 1996, possession of a stolen vehicle in 2003, and being a felon in possession of a firearm in 2007.  Ramirez denied being a member of ESV until the week earlier, when he pled guilty to the active gang participation charge.  The

16

tattoos on his body, including "13," "IE," and "SUR," did not signify his membership in any gang. He got the tattoos in prison 10 years earlier.

Ramirez had grown up his "whole life" with ESV gang members, but defendant was "just a good friend" and never told Ramirez he was a gang member. Ramirez and defendant had known each other since the mid-1990's or earlier, when Ramirez was in his early to mid-20's.

When asked under cross-examination why he was putting the methamphetamine into bags, Ramirez said he was going to give one bag to the lady who gave him the Camry in exchange for her allowing him to use the car for a couple of days. He needed the car for transportation to "sell dope," and he was going to sell or give away the rest of the methamphetamine he was putting into bags. Ramirez sought defendant's advice concerning the Camry, because "the whole situation" did not seem right to Ramirez. The woman who gave him the car did not give him the car keys; the ignition was punched; and he started the car with a screwdriver. Ramirez understood the car was about to be repossessed, and the woman told him he could take the car if he gave her some methamphetamine. Ramirez just wanted to know what defendant thought about the situation.

The prosecutor also questioned Ramirez about the letter defendant wrote to him after December 5, 2008, in which defendant discussed the charges against himself and Ramirez and wrote: "Just be sure that you don't agree to anything without us agreeing on it, because the charges are . . . real . . . petty." Ramirez recalled receiving the letter but

17

did not interpret it to mean he could not enter into a plea bargain without defendant's consent.

Ramirez denied telling Deputy Roper he could find George Espinosa, also known as Little Sleepy, at defendant's house. Ramirez said he was not arrested on December 5, 2008, and was let go after Deputy Roper told him: "We got Fred. We got who we want." Ramirez heard one of the officers tell defendant that they "got him this time," and they were going to "put him away for life[.]"

2. Defendant's Testimony

Defendant was 45 years old at the time of trial in May 2009. In 1982, he was convicted of attempted murder, assault with a deadly weapon, and second degree burglary, and served eight and one-half years in prison. In 1994 and 1995, he was convicted of being a felon in possession of a firearm. In 2005, he pled guilty to attempting to possess a dangerous weapon, a dismantled shotgun. Since he was 12 years old, the longest time he had been out of custody was an eight-month period in 2007. When he was still a minor, he was sent to the California Youth Authority for assault with a deadly weapon.

Around 1:00 a.m. on December 5, 2008, Ramirez called defendant and said he wanted to talk. Defendant said he was getting ready to go to bed, but allowed Ramirez to come over after Ramirez said he was just down the street and he would not take long. Defendant waited for Ramirez in his garage. When Ramirez arrived, he pulled out some methamphetamine and offered some to defendant. Defendant said he would take some of

18

the drug, and Ramirez put some in a bag for defendant and put the bag on a table. Ramirez had a large bag and several smaller bags of methamphetamine with him. He did not make any other bags of methamphetamine in defendant's presence.

Minutes later, sheriff's deputies arrived. The bag Ramirez made for defendant was with the other bags Ramirez grabbed when the officers were outside. The bag of methamphetamine that Detective Goodell found wrapped around defendant's belt loop and tucked into his coin pocket was a bag defendant had earlier that day; he did not get that bag from Ramirez. Defendant did not use any methamphetamine with Ramirez, but had used the drug earlier that day.

Defendant denied he was a member of ESV or "Vario Victoria Rifa," as the gang was also known, or a "high ranking" member of any gang. In "the system," however, he had always claimed "Victoria SUR."

Defendant was familiar with how ESV began and explained its history. In the late 1970's, when he was 14 or 15 years old, defendant was fighting with other "families" in the Victorville area, and he and a friend were tagging "Victoria" and "South Side." Someone crossed out "South Side" and wrote "East Side," and that was how "East Side" began.

Around 1979, defendant and other South Side families were involved in a fight against East Side families, but defendant later made peace with the East Side families. Thus, defendant was "originally an enemy of East Side." By the time he got out of prison around 1991, the East Side families had started "East Side." Defendant knew "all these

19

kids" from "East Side" because he had grown up with them or their older family members.

Defendant said the "kids" from East Side looked up to him with "a great deal of respect," but the respect he had gained over the years was not based on his membership in any gang; he was respected because he "followed the rules" and did not "snitch" on people. When he told Deputy Conley he was "in good standing," he meant he was not being threatened and was not in danger. Others sought his advice because he had experience and "three strikes."

Defendant said the CDCR "validated" him as a Mexican Mafia associate in 1988 based on information provided by other inmates. He denied he was a Mexican Mafia associate, but because he had never "debriefed" the CDCR still considered him an associate. He also denied he signed the 2004 classification sheet when it stated he was a Mexican Mafia "member," because admitting he was a member of the Mexican Mafia would be like signing his own "death warrant."

D. *Verdicts and Sentencing*

The jury found defendant guilty as charged of possessing methamphetamine and active gang participation on or about December 5, 2008. (Health & Saf. Code, § 11377, subd. (a), count 1; Pen. Code, § 186.22, sub. (a), count 2.) The trial court found defendant had three prior strike convictions (Pen. Code, § 667, subds. (b)-(e)), three prior serious felony convictions (Pen. Code, § 667, subd. (a)), and three prison priors (Pen. Code, § 667.5, subd. (b)). Defendant was sentenced to 40 years to life, comprised of 25

years to life for his active gang participation plus five years for each of his three prior serious felony convictions. An additional 25-year-to-life term and three 1-year terms were imposed but stayed on defendant's conviction for possessing methamphetamine and his three prison priors. (Pen. Code, § 654.)

## II. DISCUSSION/CONFRONTATION CLAUSE ISSUE

A. *Background*

The confrontation clause of the Sixth Amendment to the United States Constitution grants a criminal defendant the right to confront adverse witnesses. (*Dungo, supra,* 55 Cal.4th at p. 612.) This "bedrock procedural guarantee" apples to both federal and state prosecutions. (*Crawford, supra,* 541 U.S. at p. 42.) In *Ohio v. Roberts* (1980) 448 U.S. 56, 66, the high court interpreted the confrontation clause as permitting the admission of hearsay evidence against a criminal defendant if the declarant was unavailable to testify and the hearsay bore "'indicia of reliability,'" that is, if the hearsay fell within a "firmly rooted hearsay exception" or otherwise had "particularized guarantees of trustworthiness." (Fn. omitted.)

In *Crawford*, the high court overruled *Roberts* and changed confrontation clause jurisprudence from focusing on the reliability of the hearsay statement to whether it was "testimonial" and, if so, whether the criminal defendant had a prior opportunity to confront and cross-examine the declarant. *Crawford* held that the confrontation clause prohibits "'testimonial hearsay'" from being admitted in evidence against a criminal defendant unless the declarant is available to testify or the defendant had a prior

21

opportunity to cross-examine the declarant.  (*Crawford, supra,* 541 U.S. at pp. 53, 59 & fn. 9; *People v. Jennings* (2010) 50 Cal.4th 616, 651.)  Unlike testimonial hearsay, the admissibility of nontestimonial hearsay against a criminal defendant is governed exclusively by state hearsay law.  (See *Crawford, supra,* at p. 68.)

*Crawford* noted that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," that is, for nonhearsay purposes.  (*Crawford, supra,* 541 U.S. at p. 59, fn. 9, citing *Tennessee v. Street* (1985) 471 U.S. 409, 414 (*Street*); *Thomas, supra,* 130 Cal.App.4th at p. 1210.)  In a series of cases decided in the wake of *Crawford*, this and other California appellate courts held that the confrontation clause does not prohibit the admission of testimonial hearsay as basis evidence to support an expert opinion.  (*Thomas, supra,* at pp. 1209-1210; *Cooper, supra,* 148 Cal.App.4th at pp. 746-747; *Ramirez, supra,* 153 Cal.App.4th at pp. 1426-1427; *Sisneros, supra,* 174 Cal.App.4th at pp. 153-154.)

*Thomas* explained:  "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, *the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.*"  (*Thomas, supra,* 130 Cal.App.4th at p. 1210, italics added.)  *Cooper* similarly observed:  "*Crawford* was concerned with the *substantive use* of hearsay evidence . . . . It did not suggest that the

22

confrontation clause was implicated by admission of hearsay for nonhearsay purposes. . . ." (*Cooper, supra,* 148 Cal.App.4th at p. 747, italics added.)

This critical distinction between the "substantive use" of hearsay evidence for its truth and its use for nonhearsay purposes, including as basis evidence to support an expert opinion, was established in California long before *Crawford* was decided. (E.g., *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*); *People v. Gonzalez* (2006) 38 Cal.4th 932, 944-946.) As *Gardeley* explained*,* experts may base their opinions "'on reliable hearsay, including out-of-court declarations of other persons,'" and may "'state on direct examination the reasons'" for their opinions. (*Gardeley, supra,* at p. 618; Evid. Code, §§ 801, subd. (b) [expert opinion may be based on matter "whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"], 802 [expert may generally explain basis of opinions on direct examination].)

*Gardeley* thus concluded that a gang expert properly relied on and revealed to the jury the contents of otherwise inadmissible hearsay in testifying on direct examination that a hypothetical assault by three gang members was a gang-related assault. (*Gardeley, supra,* 14 Cal.4th at pp. 611-613, 618-619.) It was proper for the expert to relate the contents of the hearsay to the jury because it was not offered for its truth; it was offered for the nonhearsay purpose of explaining the basis of the expert's opinion. (*Id.* at pp. 618-619; Evid. Code, § 802.) *Gardeley* was decided eight years before *Crawford* , however, and did not address whether any of the hearsay the gang expert relayed to the

23

jury as basis evidence to support his opinion should have been limited or excluded because it was testimonial.[5]

Relying on California law articulated in *Gardeley* and on *Crawford*'s admonition that the confrontation clause does not bar the use of testimonial hearsay for nonhearsay purposes, this court concluded in *Thomas* that a gang expert, in opining that the defendant was a gang member, properly relied on and testified to the contents of hearsay statements by other gang members that the defendant was a gang member. (*Thomas, supra,* 130 Cal.App.4th at pp. 1206, 1208-1210.)

Before we issued our 2011 decision in *Archuleta I*, our appellate court colleagues in *People v Hill* (2011) 191 Cal.App.4th 1104 (*Hill*) observed that *Gardeley* and *Thomas* were based on the "implied assumption that the out-of-court statements *may help the jury evaluate the expert's opinion without regard to the truth of the statements*. Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical. But this assumption appears to be incorrect." (*Hill, supra,* at pp. 1129-1130, italics added.) This incorrect assumption, the

---

[5] *Gardeley* acknowledged but did not apply the long-standing rule that an expert's ability to recite hearsay evidence to explain the bases of the expert's opinions is limited by the trial court's "'considerable discretion'" to limit or exclude the use of hearsay as basis evidence under Evidence Code section 352, if its probative value as basis evidence is substantially outweighed by "'the risk that the jury might improperly consider it as independent proof of the facts recited therein.'" (*Gardeley, supra,* 14 Cal.4th at p. 619.) *Cooper* also pointed out that Evidence Code section 352 gives the trial court "considerable authority and discretion to prevent the wholesale admission of incompetent hearsay" from being presented to the jury under the guise of supporting the expert's opinion. (*Cooper, supra,* 148 Cal.App.4th at p. 747.)

court pointed out, masked violations of both the hearsay rule and the confrontation clause. (*Id.* at pp. 1130-1132.)

To illustrate the point, *Hill* discussed *People v. Goldstein* (2005) 6 N.Y.3d 119 [810 N.Y.S.2d 100, 843 N.E.2d 727] (*Goldstein*). There, a forensic psychiatrist, in testifying as an expert for the prosecution, claimed the defendant was not insane when he pushed a woman in front of a subway train. On direct examination, the expert relied on and testified to out-of-court statements to support her opinion. (*Hill, supra,* 191 Cal.App.4th at p. 1130.) She explained that, prior to the murder, a security guard and an acquaintance of the defendant each claimed a woman who looked remarkably like the murder victim had "'sexually frustrated'" the defendant. (*Id.* at p. 1130, fn. 15.) The court in *Goldstein* concluded the admission of the out-of-court statements as basis evidence to support the expert's opinion violated the defendant's confrontation rights. (*Goldstein, supra,* 843 N.E.2d at p. 730.) In rejecting the prosecution's argument that the statements were not admitted for their truth but only to assist the jury in evaluating the expert's opinion, the *Goldstein* court reasoned: "We find the distinction the People make unconvincing. We do not see how the jury could use the statements . . . to evaluate [the expert's] opinion without accepting as a premise either that the statements were true or that they were false. Since the prosecution's goal was to buttress [the expert's] opinion, the prosecution obviously wanted and expected the jury to take the statements as true. . . . The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful in this context." (*Id.* at pp. 732-733.)

*Hill* agreed with *Goldstein*'s point and noted that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Hill, supra,* 191 Cal.App.4th at p. 1131, fn. omitted.)[6] Still, *Hill* recognized it was bound by *Gardeley* and similar state Supreme Court precedent: "But for the long line of California Supreme Court precedent supporting *Thomas*, we would reject that opinion and adopt *Goldstein*'s logic, which seems compelling. But our position in the judicial hierarchy precludes that option; we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority." (*Hill, supra,* 191 Cal.App.4th at p. 1131, fn. omitted.) *Hill* accordingly concluded that the admission of several hearsay statements as expert opinion basis evidence, including a testimonial hearsay statement, violated neither the hearsay rule nor the confrontation clause because they were not offered as substantive evidence of their truth under the state of the law at that time. (*Id.* at pp. 1135-1137.)

In *Archuleta I*, we agreed with the *Hill* court's observation that it is often difficult, if not logically impossible, for juries to disregard the truth of hearsay statements when

---

[6] *Hill* noted that substantial academic commentary had been critical of the assumption that juries can avoid considering basis evidence for its truth when the expert relies on the evidence for its truth. (*Hill, supra,* 191 Cal.App.4th at p. 1130, fn. 16, citing, e.g., Kaye et al., New Wigmore Treatise on Evidence (2010 Cumulative Supp.) Expert Evidence, § 3.10.1, p. 59 ["'The factually implausible, formalist claim that experts' basis testimony is being introduced only to help in the evaluation of the expert's conclusions but not for its truth ought not permit an end-run around a constitutional prohibition.'"] & Mnookin, *Expert Evidence and the Confrontation Clause After* Crawford v. Washington (2007) 15 J.L. & Pol'y 791, 816 ["'To say that [inadmissible] evidence offered for the purpose of helping the jury to assess the expert's basis is not being introduced for the truth of its contents rests on an inferential error.'"].)

26

they are purportedly offered solely as basis evidence to support an expert opinion. (*Hill, supra,* 191 Cal.App.4th at pp. 1129-1131.) But like *Hill*, we recognized we were bound by *Gardeley* and similar state Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) And as discussed, this precedent adheres to a long-established *legal*—if illogical—distinction between the use of hearsay statements as substantive evidence of their truth and their purportedly distinct use as basis evidence to support an expert opinion. (See *Gardeley, supra,* 14 Cal.4th at pp. 618-619.)

Thus, in *Archuleta I*, we rejected defendant's claim that his confrontation rights were violated by the admission of Perez's testimonial statement that defendant directed the November 2008 robbery as basis evidence to support Deputy Conley's opinion that defendant was an active gang participant at the time of his December 5, 2008, arrest. (*Archuleta I, supra,* E049095.) Still, we noted that jurors in California state courts are neither expected nor instructed to disregard hearsay basis evidence for its truth in evaluating expert opinion testimony. To the contrary, CALCRIM No. 332, the standard jury instruction on expert opinion testimony, which was given here, instructs the jury it "must decide whether information on which the expert relied was true and accurate," and it may "disregard any opinion" it finds "unbelievable, unreasonable, or unsupported by the evidence." (See § 1127b [sua sponte instructions required on expert testimony].) The instruction reflects the accepted wisdom that "any expert's opinion is only as good as the truthfulness of the information on which it is based." (*Ramirez, supra,* 153 Cal.App.4th at p. 1427.) This accepted wisdom contradicts the established principle that hearsay,

27

when offered to support an expert opinion, is not offered for its truth. (*Gardeley, supra*, 14 Cal.4th at pp. 618-619.)

B. *The Williams, Lopez, Dungo, and Rutterschmidt Decisions*

As indicated, we have been instructed to vacate our 2011 decision in *Archuleta I* and reconsider the cause in light of the United States Supreme Court's 2012 decision in *Williams* and the California Supreme Court's subsequent decisions in *Lopez*, *Dungo*, *and Rutterschmidt*. In order to discern the full impact of these decisions on defendant's Sixth Amendment confrontation claim, we describe their contents in detail.

1. The Four-one-four *Williams* Decision

*Williams* arose from the kidnap, rape, and robbery of a woman in Chicago. Semen from a vaginal swab taken from the rape victim was sent to Cellmark Diagnostics Laboratory (Cellmark) for DNA analysis, and Cellmark produced a report containing a DNA profile of the semen donor. The defendant, Williams, had not been identified as a suspect in the crimes at the time the Cellmark DNA profile was generated. Williams was later arrested on unrelated charges, and the state crime lab generated a DNA profile based on his blood sample. Thereafter, state crime lab analyst Sandra Lambatos conducted a computer search of DNA profiles in the state police database to determine whether any of them matched the Cellmark DNA profile of the semen donor in the rape case. Lambatos found that the Cellmark DNA profile matched Williams's DNA profile. The victim then identified the defendant as her attacker in a police lineup. (*Williams, supra,* 132 S.Ct. at p. 2229.)

28

At Williams's bench trial for aggravated criminal sexual assault, kidnapping, and robbery, Lambatos answered "yes' when asked whether the two DNA profiles matched, over the defense counsel's objection for "lack of foundation." (*Williams, supra,* 132 S.Ct. at pp. 2229-2230.) The Cellmark report containing the DNA profile of the semen donor was not admitted into evidence. (*Id*. at p. 2230.) Nor did Lambatos quote from or read from the Cellmark DNA report or identify it as the source of any of her opinions. (*Ibid*.) Williams was found guilty and the judgment was upheld on appeal by the state Court of Appeals and Supreme Court. (*Id*. at p. 2231.) The question presented to the high court in *Williams* was "'the constitutionality of allowing an expert witness to discuss others' testimonial statements if the statements were not themselves admitted as evidence.'" (*Id.* at p. 2233.) At issue was whether Lambatos's testimony that the two DNA profiles matched violated the defendant's confrontation rights, and whether the underlying Cellmark report containing the DNA profile of the donor of the semen found on the vaginal swabs was testimonial. (*Id*. at p. 2227.)

(a) *The Four-justice Plurality Decision*

In a plurality decision by Justice Alito and joined by three other justices, Chief Justice Roberts and Justices Kennedy and Breyer, the four justices rejected Williams's confrontation clause claim on two independent grounds. The plurality first concluded that Lambatos's expert testimony that the two DNA profiles matched did not violate Williams's confrontation rights. (*Williams, supra,* 132 S.Ct. at pp. 2228, 2240.) It reasoned that the confrontation clause "has no application to out-of-court statements that

29

are not offered to prove the truth of the matter asserted," including statements "related" by an expert witness "solely for the purpose of explaining the assumptions" on which the expert's opinion is based. (*Id*. at p. 2228.) Such statements "are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Ibid*.)

The plurality distinguished the high court's decisions in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 and *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705], as involving scientific reports containing "'testimonial certification[s], made in order to prove a fact at a criminal trial.'" (*Williams, supra,* 132 S.Ct. at p. 2233.) *Melendez-Diaz* involved reports or "certificates of analysis" affirming that white powdery substances found in the defendant's possession were cocaine (see *Williams, supra,* at p. 2232), and *Bullcoming* involved a certified report that the defendant's blood-alcohol content was "0.21 grams per hundred milliliters, well above the legal limit" (see *Williams, supra,* at p. 2233). In both cases, a majority of the high court held the reports were erroneously admitted as substantive evidence against the defendants through the surrogate testimony of other laboratory analysts who had not signed and certified the reports. (See *id*. at pp. 2232-2233, 2240-2241.)

The *Williams* plurality observed that, "[f]or more than 200 years, the law of evidence has permitted the sort of testimony" given by Lambatos, and "[m]odern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge . . . ." (*Williams, supra,* 132 S.Ct. at pp. 2228, 2233-2235.) "[T]he truth of Lambatos' testimony, properly understood, was not dependent on the truth

of any predicate facts," including whether the Cellmark report was true and accurate. (*Id*. at p. 2239.) Whether the Cellmark report was true and accurate, and scientifically reliable, went to the weight of the expert's opinion that the two DNA profiles matched, not its admissibility. (*Id*. at pp. 2239-2240.) In addition, the foundational fact of the truth of the Cellmark report and its scientific reliability was shown by circumstantial evidence, including chain of custody evidence. (*Id*. at pp. 2238-2239.)

As a second and independent ground for rejecting Williams's confrontation clause claim, the plurality concluded the Cellmark report was not testimonial. (*Williams, supra,* 132 S.Ct. at pp. 2242-2244.) In every post-*Crawford* case in which the high court had found a confrontation clause violation, "the statement at issue had the primary purpose of accusing a targeted individual." (*Williams, supra,* at p. 2243.) But the Cellmark report was "very different. It plainly was not prepared for the primary purpose of accusing a targeted individual." (*Ibid*.) Instead, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence against Williams, who was neither in custody nor a suspect when the Cellmark report was prepared. (*Ibid*.)

(b) *Concurring Opinion of Justice Breyer*

In a concurring opinion, Justice Breyer joined the plurality opinion in full but wrote separately to explain why the Cellmark report—and generally all crime laboratory reports and underlying technical statements written or made by laboratory technicians— should not be considered testimonial under *Crawford*. (*Williams, supra,* 132 S.Ct. at pp. 2244-2252 (conc. opn. of Breyer, J.).) Justice Breyer explained that "[o]nce one

31

abandons the traditional rule" of treating expert opinion basis evidence as not offered for its truth, "there would seem to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call *all* of the laboratory experts who did so." (*Id*. at p. 2246.) Lower courts and treatise writers had come up with a variety of solutions to this problem, and all of them assumed "some kind of *Crawford* boundary—some kind of limitation upon the scope of its application . . . ." (*Id*. at pp. 2247-2248 (conc. opn. of Breyer, J.).) Justice Breyer called for allowing states to have "constitutional leeway to maintain traditional expert testimony rules as well as hearsay exceptions where there are strong reasons for doing so and *Crawford*'s basic rationale does not apply." (*Id*. at p. 2248.)

(c) <em>Concurring Opinion of Justice Thomas</em>

In a concurring opinion, Justice Thomas agreed that the disclosure of Cellmark's out-of-court statements through the expert testimony of Lambatos did not violate the confrontation clause, but only because the statements "lacked the requisite 'formality and solemnity' to be considered '"testimonial"' for purposes of the Confrontation Clause." (*Williams, supra,* 132 S.Ct. at pp. 2255, 2259-2260 (conc. opn. of Thomas, J.).) Justice Thomas's agreement with the plurality's conclusion that the Cellmark report was not testimonial—though for a different reason than the plurality adopted—provided the fifth and deciding vote for upholding the judgment of conviction in *Williams*.

32

Justice Thomas disagreed with the plurality's reasoning in every respect, including its conclusion that the Cellmark report was not admitted for its truth but only to show the basis of Lambatos's opinion that the two DNA profiles, including the one recorded in the Cellmark report, matched.  (*Williams, supra,* 132 S.Ct. at pp. 2255-2259 (conc. opn. of Thomas, J.).)  In Justice Thomas's view, "there was no plausible reason for the introduction of Cellmarks' statements other than to establish their truth."  (*Id*. at p. 2256.) He remarked that the rules of evidence—that basis evidence to support an expert opinion not offered for its truth—should not "so easily trump a defendant's confrontation right." (*Ibid*.)

Justice Thomas distinguished *Street*, *supra,* 471 U.S. at page 417, the case cited in *Crawford* for the proposition that the confrontation clause does not bar the use of out-of-court statements for purposes other than their truth.  (*Williams, supra,* 132 S.Ct. at p. 2256 (conc. opn. of Thomas, J.); *Crawford, supra,* 541 U.S. at p. 59, fn. 9.)  The defendant in *Street* testified he gave a false confession after the police coerced him to adopt his accomplice's confession.  (*Street, supra,* at p. 411.)  The prosecution then introduced the accomplice's confession to show the ways the two confessions differed and counter the defendant's claim that he gave a false confession.  (*Id*. at pp. 411-412.) In rejecting the defendant's confrontation clause claim, the high court held the accomplice's out-of-court confession was not offered for its truth, but only to impeach the defendant's version of events, and the out-of-court confession was therefore not hearsay "under traditional rules of evidence."  (*Id*. at pp. 413-414.)  Justice Thomas

33

pointed out that the high court in *Street* "did not accept that nonhearsay label at face value," but "thoroughly examined the use of the out-of-court confession and the efficacy of a limiting instruction before concluding that the Confrontation Clause was satisfied '[i]n this context.'" (*Williams, supra,* at p. 2257 (conc. opn. of Thomas, J.).)

Justice Thomas concluded that in contrast to the out-of-court confession in *Street*, "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." (*Williams, supra,* 132 S.Ct. at p. 2257 (conc. opn. of Thomas, J.).) Justice Thomas also took issue with the plurality's claim that there was a long-standing historical practice of exempting expert basis testimony from "the rigors" of the confrontation clause. (*Ibid.*) He warned that "[t]oday's holding" would "reach beyond scientific evidence to ordinary out-of-court statements," including interviews with third parties, upon which experts commonly rely in forming their opinions. (*Id.* at p. 2259, citing *Goldstein, supra,* 843 N.E.2d at pp. 729-730.)

(d) *The Four-justice Dissenting Opinion*

Justice Kagan wrote a dissenting opinion joined by Justices Scalia, Ginsburg, and Sotomayor. (*Williams, supra,* 132 S.Ct. at pp. 2264-2277 (dis. opn. of Kagan, J.).) The dissenters agreed with Justice Thomas that the Cellmark report, conforming the DNA profile produced from the semen taken from the rape victim's vaginal swab, was effectively admitted for its truth through the "conduit" testimony of Lambatos. (*Id.* at pp.

34

2266-2267.)  The dissenters viewed the case as "functionally identical" to *Bullcoming* and *Melendez-Diaz,* which involved out-of-court scientific reports impermissibly introduced for their truth through the "'surrogate'" testimony of experts, in violation of the defendants' right to confront the analysts who prepared the testimonial reports.  (*Id*. at p. 2266.)  Like Justice Thomas, the four dissenters agreed the Cellmark report "ha[d] no purpose separate from its truth[.]"  (*Id*. at p. 2269.)

The dissenters disagreed with the plurality's claim that Lambatos merely "assumed" the Cellmark DNA profile came from the victim's vaginal swabs.  (*Williams, supra,* 132 S.Ct. at p. 2270 (dis. opn. of Kagan, J.).)  To the contrary, they pointed out that Lambatos "affirmed, without qualification," that the report contained a male DNA profile found in the semen taken from the victim's vaginal swabs.  (*Ibid*.)  And Lambatos's description of the report was offered for its truth because "that is all such 'basis evidence' can be offered for; . . . the only way the factfinder could consider whether [the Cellmark report] supported her opinion (that the DNA on [the victim's] swabs came from Williams) was by assessing the statement's truth."  (*Id*. at p. 2271 (dis. opn. of Kagan, J.).)  The dissenters criticized the plurality's "not-for-the-truth rationale" as an "abdication to state-law labels," and noted that the high court did "not typically allow state law to define constitutional requirements."  (*Id*. at p. 2256 (conc. opn. of Thomas, J.); *id.* at p. 2272 (dis. opn. of Kagan, J.).)

The dissenters found the Cellmark report testimonial because it "was made for the primary purpose of establishing 'past events potentially relevant to later criminal

prosecution'—in other words, for the purpose of providing evidence." (*Williams, supra,* 132 S.Ct. at p. 2273 (dis. opn. of Kagan, J.), quoting *Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).) The dissenters criticized the plurality's conclusion that the report was not testimonial because it was "'not prepared for the primary purpose of accusing a targeted individual.'" (*Williams, supra,* at p. 2273.) The dissenters and Justice Thomas criticized the plurality's "targeted individual" or "accusation test" as having no basis in the text or history of the confrontation clause. (*Id.* at p. 2263 (conc. opn. of Thomas, J.); *id.* at p. 2273 (dis. opn. of Kagan, J.).)

2. *Lopez, Dungo,* and *Rutterschmidt*

In this trio of companion decisions, the California Supreme Court considered how *Williams* and other high court decisions applied to out-of-court statements recorded in forensic reports and relayed at the defendants' criminal trials through the testimony of expert witnesses. (*Lopez, supra,* 55 Cal.4th 569 [laboratory report recorded percentage of alcohol found in the defendant's blood sample]; *Dungo, supra,* 55 Cal.4th 608 [autopsy report recorded condition of alleged murder victim's body]; *Rutterschmidt*, *supra,* 55 Cal.4th 650 [toxicology report showed alleged murder victim had drugs in his system that could have caused drowsiness].) The justices wrote nine separate opinions in these decisions, illustrating the "muddled state" of the confrontation clause jurisprudence. (*Lopez, supra,* at p. 590 (dis. opn. of Liu, J.).)

36

(a) *Lopez*

*Lopez* involved a laboratory analyst's report on the percentage of alcohol found in a blood sample taken from the defendant two hours after her vehicle collided with another, killing its driver. (*Lopez, supra,* 55 Cal.4th at p. 573.) According to the report, the defendant had a blood-alcohol concentration (BAC) of 0.09 percent at the time her blood sample was drawn. (*Id.* at p. 574.) The laboratory analyst who prepared and signed the report, Jorge Pena, did not testify at the defendant's trial for vehicle manslaughter while intoxicated, and the prosecution did not assert Pena was unavailable. (*Id.* at pp. 573-574.) Another analyst, John Willey, who was employed by the same laboratory as Pena and was familiar with its "'procedures for processing blood samples for alcohol analysis,'" testified that Pena's report showed the defendant's BAC was 0.09 percent. (*Id.* at p. 574.) Willey "added that based on his own 'separate abilities as a criminal analyst,' he too concluded that the [BAC] in defendant's blood sample was 0.09 percent." (*Ibid.*) A toxicologist testified a person with a BAC of 0.09 percent two hours after a collision who had consumed no alcohol after the collision would have been intoxicated at the time of the collision, with a BAC level of .012 percent. (*Id.* at pp. 574-575 & fn. 1.) A jury found the defendant guilty. (*Id.* at p. 575.)

In a five-justice majority opinion by Justice Kennard, the court held that "critical portions" of Pena's "machine-generated" report were not made with "the requisite degree of formality or solemnity to be considered testimonial." (*Lopez, supra,* 55 Cal.4th at pp. 582-584.) A log sheet notation on the report showed the defendant's blood sample was

37

labeled "laboratory No. 070-7737," and the notation was entered by a laboratory assistant, Constantino. (*Id*. at p. 584.) The notation linked the defendant's name to blood sample No. 070-7737, but the report indicated the notation was made "FOR LAB USE ONLY," and the court found the notation was "nothing more than an informal record of data for internal purposes . . . ." (*Ibid*.) Thus, the majority concluded the notation was not made with the requisite degree of formality required for testimonial statements. (*Id*. at pp. 584-585.) In addition, neither Pena nor Constantino "signed, certified, or swore to the truth of the contents of page 1 of the report," which showed the defendant's BAC was 0.09 percent based on the blood sample. (*Id*. at pp. 582-584.) The court distinguished the "laboratory certificates" in *Melendez-Diaz* and *Bullcoming* as made with a sufficient degree of solemnity and formality to be testimonial. (*Lopez, supra,* at pp. 584-585; *Melendez-Diaz v. Massachusetts, supra,* 557 U.S. at p. 308; *Bullcoming v. New Mexico, supra,* 564 U.S. at p. ___ [131 S.Ct. at p. 2717].) Because the notation in Pena's report that the defendant's BAC was 0.09 was not sufficiently formal to be testimonial, the court found no need to consider the primary purpose of that part of the report. (*Lopez, supra,* at p. 582.) There was no confrontation clause violation because the critical parts of Pena's report were not testimonial. (*Id*. at p. 585.)

(b) *Dungo*

In *Dungo*, forensic pathologist Dr. Robert Lawrence testified that after reviewing an autopsy report prepared by a nontestifying pathologist, Dr. George Bolduc, and photographs taken at the autopsy, the alleged murder victim died from asphyxia caused

by strangulation. (*Dungo, supra,* 55 Cal.4th at pp. 613-614.) In support of his opinion, Dr. Lawrence described the condition of the victim's body based on the autopsy report and photographs, which were not admitted into evidence. (*Id*. at pp. 614-615.) Dr. Lawrence did not describe Dr. Bolduc's opinion of the cause of the victim's death stated in the autopsy report; he only gave his "independent opinion" of the cause of death as a forensic pathologist. (*Ibid*.) Nor did Dr. Lawrence say whether his opinion of the cause of death was based solely on the autopsy report, the autopsy photographs, or a combination of the two. (*Ibid*.) The defendant was found guilty of second degree murder. (*Id*. at p. 615.)

(i) *Majority Opinion by Justice Kennard*

In a majority opinion by Justice Kennard, joined by four other justices, the *Dungo* court concluded that Dr. Lawrence's testimony describing the condition of the victim's body (based on the autopsy report and photographs) did not violate the defendant's right to confront Dr. Bolduc, the author of the report. (*Dungo, supra,* 55 Cal.4th at pp. 613-614.) First, the court found it unnecessary to decide whether the "entire report" was testimonial because it was not admitted into evidence. (*Id*. at p. 619.) The court also declined to determine whether Dr. Bolduc's conclusion regarding the cause of death, as set forth in the autopsy report, was testimonial because Dr. Lawrence did not rely on the conclusion in forming his opinion of the cause of death. (*Ibid*.)

Based on *Williams* and the court's companion decision in *Lopez*, the court distilled a general test for determining whether a statement is testimonial: "[T]estimonial out-of-

39

court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Dungo, supra,* 55 Cal.4th at p. 619.) Still, the court noted that the justices of the United States Supreme Court had yet to agree on what the out-of-court statement's primary purpose must be. (*Ibid.*)

Applying this two-part test, the *Dungo* majority held Dr. Bolduc's observations of the condition of the victim's body (set forth in the autopsy report) were nontestimonial because such observations "*merely record objective facts* [and] are less formal than statements setting forth a pathologist's expert conclusions." (*Dungo, supra,* 55 Cal.4th at p. 619, italics added.) Further, "criminal investigation" was only one of several purposes and not the primary purpose of describing the condition of the body in the report. (*Id.* at p. 621.) Descriptions of the condition of the body serve other purposes; they help the decedent's relatives determine whether to file an action for wrongful death; they help insurance companies determine whether the death is covered by insurance; and they allow grieving family members and members of the public to know the condition of the body and cause of death. (*Ibid.*)

(ii) *Concurring Opinion by Justice Werdegar*

Justice Werdegar wrote a concurring opinion joined by Chief Justice Cantil-Sakauye and Justices Baxter and Chin. (*Dungo, supra,* 55 Cal.4th at pp. 621-627 (conc. opn. of Werdegar, J.).) The opinion emphasized that the most significant part of Dr.

40

Bolduc's out-of-court recordings of the condition of the victim's body was his observation that the victim's larynx and hyoid bone were both unbroken.  (*Id*. at p. 622 (conc. opn. of Werdegar, J.).)  Based on these observations, Dr. Lawrence concluded the victim was strangled for "'a period of minutes . . . certainly more than two minutes,'" and the prosecution used this part of the doctor's opinion in arguing to the jury that the killing was intentional and premeditated.  (*Ibid*.)

Still, the concurring justices agreed the nontestimonial aspects of Dr. Bolduc's out-of-court observations on the state of the victim's larynx and hyoid bone predominated over the testimonial.  (*Dungo, supra,* 55 Cal.4th at p. 625 (conc. opn. of Werdegar, J.).)  The process of performing an autopsy by examining the decedent's body and recording the resulting observations is governed "primarily by *medical* standards rather than by legal requirements of formality or solemnity."  (*Id*. at p. 624 (conc. opn. of Werdegar, J.).)  And even though such observations on the condition of the decedent's body are made "partly 'to provide evidence for court,'" they are also made "'to serve as a record'" and "'to support or refute interpretations.'"  (*Id*. at p. 625 (conc. opn. of Werdegar, J.).)

The opinion pointed out that a statement "should also be deemed more testimonial to the extent it was produced through the agency of government officers engaged in a prosecutorial effort, and less testimonial to the extent it was produced for purposes other than prosecution or without the involvement of police or prosecutors."  (*Dungo, supra,* 55 Cal.4th at pp. 625-626 (conc. opn. of Werdegar, J.).)  It did not appear that Dr. Bolduc's observations on the condition of the decedent's body, including the fact her larynx and

41

hyoid bone were unbroken, were "produced through a prosecutorial effort to obtain evidence against [the] defendant, or anyone else, for use at trial." (*Id*. at pp. 626-627 (conc. opn. of Werdegar, J.).)

In the final paragraph of her concurring opinion, Justice Werdegar acknowledged that "Dr. Bolduc's observations were introduced for their truth, and since Dr. Bolduc was not shown to be unavailable and had not been subject to prior cross-examination on this matter by defendant, his statements, were they testimonial, would have been inadmissible under *Crawford*." (*Dungo, supra,* 55 Cal.4th at p. 627 (conc. opn. of Werdegar, J.).)

(iii)  *Concurring Opinion by Justice Chin*

In a concurring opinion joined by three other justices, Justice Chin concluded there was no confrontation clause violation in *Dungo* under the reasoning of the plurality opinion in *Williams* and Justice Thomas's concurring opinion and fifth and deciding vote in *Williams*.  (*Dungo, supra,* 55 Cal.4th at pp. 627-633 (conc. opn. of Chin, J.).)

(iv)  *Dissenting Opinion by Justice Corrigan*

In a dissenting opinion joined by Justice Liu, Justice Corrigan concluded that Dr. Bolduc's autopsy report was "sufficiently formal and primarily made for an evidentiary purpose, as the United States Supreme Court has explicated those terms to date." (*Dungo, supra,* 55 Cal.4th at pp. 633-649 (dis. opn. of Corrigan, J.).)  The dissenting opinion also noted that five of the nine justices in *Williams* disagreed with the four-justice plurality's conclusion that the Cellmark report "was not hearsay at all because its contents were not admitted for their truth." (*Dungo, supra,* at p. 635.)  And in a footnote,

42

the dissenting opinion pointed out that out-of-court statements may or may not be offered for their truth: "There are of course, many instances in which out-of-court statements are not offered for their truth. The long-standing rule that unless a statement is admitted for its truth it is not hearsay remains unchanged. The question is whether a statement *is* admitted for its truth. When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth." (*Id*. at p. 635, fn. 3.)

(c) *Rutterschmidt*

In *Rutterschmidt*, two female codefendants in their mid-70's were convicted of murdering two men on separate occasions by running over them with cars. (*Rutterschmidt, supra,* 55 Cal.4th at p. 652.) The prosecution claimed one of the victims was drugged before he was killed. (*Id*. at p. 655.) To prove this, the prosecution presented the expert testimony of Joseph Muto, a laboratory director, toxicologist, and certified blood analyst who testified that several laboratory analysts working under his supervision had tested samples of the victim's blood and found the presence of drugs causing sleep, pain killers, and other drugs with side effects of sedation and dizziness. (*Id*. at pp. 655-656.) The laboratory reports were not admitted into evidence. (*Id*. at p. 656.) A forensic toxicologist testified the combination of the drugs in the victim's blood would cause a person who did not regularly use them to fall asleep, and would cause a regular user of the drugs to become drowsy and confused. (*Ibid*.)

One of the defendants, Helen Golay, claimed Muto's expert testimony violated her Sixth Amendment right to confront the laboratory analysts who prepared the reports. (See *Rutterschmidt, supra,* 55 Cal.4th at p. 661.)  In a unanimous decision, the *Rutterschmidt* court found it unnecessary to determine whether Muto's expert testimony violated Golay's right to confront the laboratory analyst who tested the victim's blood and prepared the report because there was overwhelming evidence of the defendants' guilt notwithstanding Muto's expert testimony.  (*Ibid.*)

C.  *Application and Analysis*

1.  The "For Truth" Consensus

Five of the nine United States Supreme Court justices in *Williams* agreed that the Cellmark report, which recorded the DNA profile of the male donor of the semen found on the rape victim's vaginal swabs, was effectively offered for its truth, even though it was not admitted into evidence and was offered solely as basis evidence to support Lambatos's expert opinion that the DNA profile recorded in the Cellmark report matched the DNA profile generated from the defendant's blood sample.  (*Williams, supra,* 132 S.Ct. at pp. 2255-2259 (conc. opn. of Thomas J.); *id.* at pp. 2264-2277 (dis. opn. of Kagan. J.).)  Four of the seven California Supreme Court justices in *Dungo* agreed that the out-of-court observations of the nontestifying expert, Dr. Buldoc, concerning the condition of the victim's body and recorded in the autopsy report, "were introduced for their truth," and because Dr. Buldoc was not shown to be unavailable to testify, his observations would have been inadmissible under *Crawford*, had they been testimonial.

44

(*Dungo, supra,* 55 Cal.4th at p. 627 (conc. opn. of Werdegar, J., joined by Cantil-Sakauye, C.J., Baxter, J., and Chin, J.).)  And the dissenting justices in *Dungo* observed: "When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth."  (*Id*. at p. 635, fn. 3 (dis. opn. of Corrigan, J., joined by Liu, J.).)

This new consensus for treating expert opinion basis evidence as offered for its truth *when the expert testifies to its contents* reflects the *Hill* and *Goldstein* courts' observations that it makes no sense to hold that out-of-court statements are not offered or understood for their truth when an expert relies on them for their truth and relays their contents to the trier of fact for the purpose of explaining the basis of the expert's opinion. (*Hill, supra,* 191 Cal.App.4th at pp. 1129-1132; *Goldstein, supra,* 843 N.E.2d at pp. 732-733.)  In their dissenting opinion in *Dungo*, Justices Corrigan and Liu explained that out-of-court statements *may or may not be* offered for their truth through expert witness testimony.  (*Dungo, supra,* 55 Cal.4th at p. 635, fn. 3 (dis. opn. of Corrigan, J.).)  They are offered for their truth "[w]hen an expert witness treats as factual the contents of [the] out-of-court statement, and relates as true the contents of that statement to the jury . . . ." (*Ibid*.)

The court in *People v. Valadez* (2013) 220 Cal.App.4th 16 recently acknowledged the majority consensus in *Williams* and *Dungo* for treating expert opinion basis evidence for its truth:  "Since *Hill*, a majority of justices on both the United States Supreme Court

45

and our high court have indicated expert basis evidence is offered for its truth and subject to the confrontation clause." (*People v. Valadez, supra,* at p. 31.) "If the currently constituted courts were called upon to resolve this issue, it seems likely the holdings in *Thomas*, *Hill*, and other cases extending *Gardeley* to find out-of-court statements offered as expert basis evidence are not offered for their truth for confrontation purposes will be significantly undermined." (*Id*. at p. 32 & fn 13.) We agree.

In our view, the consensus expressed in *Williams* and *Dungo* for treating expert opinion basis evidence as offered for its truth means that the long-standing California rule, that experts may recite the contents of otherwise inadmissible hearsay on direct examination under the guide of supporting their opinions, affirmed in *Gardeley, supra,* 14 Cal.4th at pages 618 and 619 and followed in *Thomas*, *Cooper*, *Ramirez*, *Sisneros*, *and Hill*, among other cases, has been qualified as follows: When, on direct examination, an expert witness against a criminally accused "treats as factual" the contents of an out-of-court testimonial statement and "relates as true" its contents to the trier of fact (*Dungo, supra,* 55 Cal.4th at p. 635, fn. 3 (dis. opn. of Corrigan, J.)), the declarant is unavailable to testify, and the defendant had no prior opportunity for cross-examination, the admission of the testimonial statement as expert opinion basis evidence will violate the defendant's Sixth Amendment right to confront and cross-examine the declarant.

We believe this rule represents a "single standard" for determining when testimonial out-of-court statements are offered for their truth through expert testimony and violate the confrontation clause "which, when applied, will necessarily produce

46

results with which a majority" of the justices in *Williams* and *Dungo* would agree. (*U.S. v. Alcan Aluminum Corp.* (2d Cir. 2003) 315 F.3d 179, 189 [a single legal standard constituting the narrowest ground for a decision is the "law of the land"]; *Lopez, supra,* 55 Cal.4th at pp. 591-593 (dis. opn. of Liu, J.) [the "law of the land" may be discerned by identifying a single legal standard with which a majority of the United States Supreme Court justices would agree].)

Similarly, in the federal courts, prosecutors are not allowed to use experts as mere "conduits" to "parrot" or "transmit" testimonial hearsay to the jury; instead, the experts must apply their expertise and independent judgment to the testimonial hearsay *without transmitting its contents to the jury*. (E.g., *United States v. Gomez* (9th Cir. 2013) 725 F.3d 1121, 1129-1131.) The "broad contours" of the federal court doctrine are as follows: "An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot 'out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion' would provide an end run around *Crawford*. [Citation.] For this reason, an expert's use of testimonial hearsay is a matter of degree. The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an

47

independent judgment, there will typically be no *Crawford* problem.  The expert's opinion will be an original product that can be tested through cross-examination."  (*Id*. at p. 1129, quoting *United States v. Johnson* (4th Cir. 2009) 587 F.3d 625, 635-636 (*Johnson*); *United States v. Pablo* (10th Cir. 2012) 696 F.3d 1280. 1286-1293 [there are no "clearly established bright line parameters" for determining when expert testimony violates *Crawford*].)

In *Johnson, supra,* 587 F.3d 625, the court found no confrontation clause violation because "the experts never made direct reference to the content of [testimonial] interviews or even stated with any particularity what they learned from those interviews. Instead, each expert presented his independent judgment and specialized understanding to the jury," based on the expert's many years of experience and investigations.  (*Id*. at pp. 635-636.)  But in *United States v. Mejia* (2d Cir. 2008) 545 F.3d 179 (*Mejia*), the expert testified that a gang "taxed" nongang members who wanted to deal drugs in bars controlled by the gang, and the expert explained he had been told this important fact "by a gang member" during a custodial interview.  (*Id*. at p. 188.)  *Mejia* concluded that the expert's testimony violated *Crawford*, and noted that, "the question under *Crawford* is whether the expert 'applied his expertise to those statements but did not directly convey the substance of the statements to the jury . . . .'"  (*Id*. at pp. 198-199, quoting *United States v. Lombardozzi* (2d Cir. 2007) 491 F.3d 61, 73; see also *United States v. Dukagjini* (2d Cir. 2002) 326 F.3d 45, 59.)

48

We believe the federal rule represents the proper standard.  Experts may rely on testimonial hearsay in formulating their opinions (*Gardeley, supra,* 14 Cal.4th at p. 618), but they may not repeat or parrot the contents of testimonial hearsay to the jury on direct examination under the guise of explaining the basis of their opinions, unless the declarant is available or the defendant has had a prior opportunity for cross-examination (*Crawford, supra,* 541 U.S. at p. 59; Evid. Code, § 802).

The People argue we are bound by *Gardeley*'s holding that expert opinion basis evidence is not offered for its truth, even when the expert relates the contents of testimonial hearsay on direct examination against a criminal defendant.  (*Auto Equity Sales, Inc.  v. Superior Court, supra,* 57 Cal.2d at p. 455 ["Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction."].)  We disagree.  Cases are not authority for propositions not considered.  (*People v. Friedeck* (2010) 183 Cal.App.4th 892, 899.) *Gardeley* was decided before *Crawford* and did not address whether *testimonial* hearsay is offered for its truth and violates the confrontation clause when an expert recites its contents on direct examination against a criminally accused.  And as discussed, a majority of the justices in *Williams* and *Dungo* agreed that such surrogate use of testimonial hearsay for its truth violates the confrontation clause.

This court's 2005 decision in *Thomas* and decisions in accord with *Thomas* must be qualified in the same manner as *Gardeley*.  (*Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210 [testimonial out-of-court statements offered as expert opinion basis evidence

in criminal trials *are never* offered for their truth and, as such, do not violate the confrontation clause]; *Cooper, supra,* 148 Cal.App.4th at pp. 746-747 [same]; *Ramirez, supra,* 153 Cal.App.4th at pp. 1426-1427 [same]; *Sisneros, supra,* 174 Cal.App.4th at pp. 153-154 [same].)  Courts may no longer assume that all out-of-court statements are not offered for their truth when they are offered as expert opinion basis evidence, and that it is therefore unnecessary to determine whether out-of-court statements are testimonial when offered as expert opinion basis evidence.  An expert witness against a criminally accused must not be allowed to testify to the contents of testimonial hearsay on direct examination, unless the declarant is available or the defendant had a prior opportunity for cross-examination.[7]

The People further argue that prohibiting experts from relating the contents of testimonial hearsay on direct examination in criminal trials will lead to "endless" Evidence Code section 402 hearings to determine the admissibility of expert opinion basis evidence.  To be sure, when a criminal defendant challenges the admissibility of expert opinion basis evidence on the ground it is testimonial hearsay, the burden is on the

---

[7] *Thomas*, *Cooper*, and *Ramirez* did not address whether the testifying gang experts relayed the contents of any *testimonial* hearsay to the jury in explaining the basis of their opinions, given that the hearsay basis evidence was not offered for its truth and therefore did not violate the confrontation clause even if it was testimonial.  (*Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210; *Cooper, supra,* 148 Cal.App.4th at p. 747; *Ramirez, supra,* 153 Cal.App.4th at p. 1427.)  *Sisneros* plainly did not involve any testimonial hearsay.  There, the gang expert relied on a witness's *conduct* in refusing to testify against the defendant to support his opinion that the Mexican Mafia engaged in witness intimidation.  (*Sisneros, supra,* 174 Cal.App.4th at pp. 149, 153.)  The court noted that the witness "never testified" and "never offered any statement, much less a testimonial statement."  (*Id*. at p. 153.)

50

People, as the proponent of the evidence, to show by a preponderance of the evidence that the hearsay is not testimonial. (*United States v. Jackson* (5th Cir. 2011) 636 F.3d 687, 695; *State v. Koslowski* (2009) 166 Wn.2d 409, 417, fn. 3 [209 P.3d 479, 483, fn. 3].) If no objection is made, the evidence is generally admissible. (*Waters v. State* (2008) 2008 Tex.App. Lexis 5160 [at p. *9].)

But not all or perhaps even most expert opinion basis evidence will be testimonial. Gang experts, for example, typically rely on a plethora of information and out-of court statements in formulating their opinions, many of which are not testimonial. (*People v. Valadez, supra,* 220 Cal.App.4th at pp. 35-36 [general background information on gangs that gang expert obtained through casual, consensual encounters with gang members, from other officers, and in written materials, was not testimonial]; *Hill, supra,* 191 Cal.App.4th at pp. 1135-1136 [statements obtained in consensual conversations with gang members, both in and out of custody, but not with an eye toward prosecuting any particular defendant, were not testimonial]; *People v. Sanchez* (2014) 223 Cal.App.4th 1 [at pp. **33-34] [gang member's statement identifying person who shot him in 2007 not testimonial in the defendant's trial on other charges, because the declarant could not have anticipated that his statement would be used against the defendant for a crime that occurred after the statement was made].)[8]

---

[8] *Williams*, *Lopez*, *Dungo*, *and Rutterschmidt* further illustrate that not all expert opinion basis evidence will be testimonial. These cases involved a distinct type of out-of-court statement used as expert opinion basis evidence: statements recorded laboratory or forensic reports with varying degrees of solemnity or formality and, at least arguably, for primary purposes other than criminal prosecution. (*Williams, supra,* 132 S.Ct. at p.

*[footnote continued on next page]*

Additionally, courts have long had "considerable discretion" to control the form of expert questioning in order to prevent experts from placing incompetent hearsay evidence before the jury. (*Gardeley, supra,* 14 Cal.4th at p. 619.) Courts also have discretion, under Evidence Code section 352, "'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.'" (*Ibid.*, quoting *People v. Coleman* (1985) 38 Cal.3d 69, 91, disapproved on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) Preventing prosecution experts in criminal trials from reciting the contents of testimonial hearsay on direct examination should be no more difficult than controlling the form of expert questioning or limiting expert testimony under Evidence Code section 352, as courts have traditionally done in criminal and civil cases. (*People v. Coleman, supra,* at p. 91; *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788-789 [Fourth Dist., Div. Two].)

---

*[footnote continued from previous page]*
2243 (plur. opn. of J. Alito) [Cellmark report showing DNA profile of semen donor not testimonial because it was not made for the primary purpose of implicating a targeted individual in a crime]; *id.* at p. 2255 (conc. opn. of Thomas, J.) [Cellmark report lacked requisite formality and solemnity to be testimonial]; *Lopez, supra,* 55 Cal.4th at p. 582 [laboratory report showing alcohol content in the defendant's blood sample not made with sufficient solemnity or formality to be testimonial]; *Dungo, supra,* 55 Cal.4th at p. 621 [objective facts about condition of victim's body, related by expert to jury based on out-of-court statements in autopsy report and accompanying photographs, insufficiently formal and solemn to be testimonial and criminal investigation was not the primary purpose of recording the facts]; see also *Rutterschmidt, supra,* 55 Cal.4th at p. 661 [declining to determine whether toxicology report showing presence of drugs in victim's blood sample was testimonial because any error in allowing the expert to rely upon or refer to the report was harmless beyond a reasonable doubt]; *People v. Barba* (2013) 215 Cal.App.4th 712, 731-743 [collecting and discussing forensic evidence cases].)

As we next explain, Perez's out-of-court statement that defendant directed the November 2008 robbery was testimonial, and Deputy Conley related its contents to the jury for their truth in explaining the basis of his opinion that defendant was an active gang participant at the time of his December 5, 2008, arrest. Perez's statement was of no value to support Deputy Conley's opinion unless the jury accepted it for its truth, and the jury was instructed to consider the statement for its truth. (CALCRIM No. 332.) Nor was there any showing that Perez was unavailable to testify or that defendant had a prior opportunity to cross-examine him. (*Crawford, supra,* 541 U.S. at p. 59.) Thus, Deputy Conley's testimony on this point violated defendant's Sixth Amendment right to confront and cross-examine Perez.

2. Perez's Statement Was Testimonial

*Crawford* observed that the confrontation clause applies to "'witnesses' against the accused—in other words, those who 'bear testimony.'" (*Crawford, supra,* 541 U.S. at p. 51.) "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.]" (*Ibid*.) Though *Crawford* did not spell out a comprehensive definition of what constitutes a testimonial statement (*id*. at p. 68, fn. omitted ["We leave for another day any effort to spell out a comprehensive definition of 'testimonial'"]), the high court explained that "some statements qualify [as testimonial] under any definition" (*id*. at p. 52).

Statements that qualify as testimonial under any definition fall into a "core class" of testimonial statements for which the confrontation clause was "especially" concerned

53

(*id*. at pp. 51-53), and include, "at a minimum," prior testimony and "police interrogations" (*id*. at pp. 51-53, 68; *People v. D'Arcy* (2010) 48 Cal.4th 257, 290).[9] *Crawford* concluded that a recorded statement by the defendant's wife, knowingly given in response to structured police questioning during a police interrogation and directly implicating her husband in a crime, qualified as testimonial "under any conceivable definition." (*Crawford, supra,* at pp. 38, 52, 54, fn. 4.)

The high court later clarified that not all statements given in response to police questioning are testimonial: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822, fn. omitted; *Michigan v. Bryant* (2011) ___ U.S. ___ [131 S.Ct. 1143, 1156-1157 (*Bryant*) [clarifying *Davis* in context of statements given by a mortally wounded victim to officers responding to the scene]; *People v. Blacksher* (2011) 52 Cal.4th 769, 811-816

---

[9] More specifically, "core class" testimonial statements include "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' . . . 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions' [citation] [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . .'" (*Crawford, supra,* 541 U.S. at pp. 51-52.)

[interpreting *Bryant* as counseling courts to consider six factors in determining primary purpose of statement given to police in ongoing emergency].)

In *People v. Cage* (2007) 40 Cal.4th 965, the California Supreme Court distilled several "basic principles" from *Davis* and concluded that "the proper focus" in determining whether a statement is testimonial "is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial." (*People v. Cage, supra,* at p. 984, fn. 14.) Rather, the confrontation clause is concerned with statements which, "*viewed objectively*, are [taken and given] for the *primary purpose* of establishing or proving facts for possible use in a criminal trial" (*ibid.*), "under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony" (*id.* at p. 984, fn. omitted).[10] The inquiry "is on the *primary* purpose of both [the] officer and declarant." (*People v. Blacksher, supra,* 52 Cal.4th at pp. 813-814.)

---

[10] *Cage* derived six "basic principles" from *Davis*: "First . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra,* 40 Cal.4th at p. 984, fns. omitted.)

Like the custodial interrogation statement by the defendant's wife in *Crawford*, directly implicating her husband in a crime, Perez's out-of-court statement that defendant directed Perez and other ESV gang members to commit the November 2008 robbery of a Victorville drug dealer was testimonial "under any conceivable definition." (*Crawford, supra,* 541 U.S. at pp. 51-52, 54, fn. 4.) Indeed, the statement was testimonial even under the more narrow and controversial definition proposed by the four-justice plurality in *Williams*: its primary purpose was to accuse *a targeted individual*, namely, the defendant, of a crime. (*Williams, supra*, 132 S.Ct. at p. 2243 (plur. opn. of Alito, J.).)

In explaining the basis of his opinion that defendant was an active participant in the ESV on or about December 5, 2008, Deputy Conley testified on direct examination that Perez made the statement "to investigators," and that Perez and Jorge Espinosa, also gang members, were arrested and charged for the robbery and murder of Joseph Delonie, another gang member, who was shot and killed during the robbery. The record supports a reasonable inference that Perez made the statement during a custodial interrogation, and that the statement was elicited and given for the primary purpose of recording past facts for possible use in a criminal trial. (*People v. Cage, supra,* 40 Cal.4th at p. 984.) There is no indication that the statement was made under circumstances involving an ongoing emergency or public safety threat, or even that it was made or given for any purpose other than implicating defendant in a crime.[11]

---

[11] The People argue the record does not "clearly indicate" that Perez's statement "to investigators" was made during a custodial interrogation, but this is an unnecessary condition to defendant's confrontation claim. The People had the burden of showing by a

*[footnote continued on next page]*

3. The Error Was Harmless Beyond a Reasonable Doubt

Reversal of defendant's convictions is required unless the People have shown beyond a reasonable doubt that the prosecution's use of Perez's testimonial hearsay statement for its truth, as basis evidence to support Deputy Conley's opinion that defendant was a high-ranking gang member on or about December 5, 2008, did not contribute to the verdicts. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Rutterschmidt, supra,* 55 Cal.4th at p. 661.) The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; *People v. Flood* (1998) 18 Cal.4th 470, 515.) Here, the verdicts on the possession and active gang participation charges were surely unattributable to Perez's testimonial hearsay statement.

---

*[footnote continued from previous page]*
preponderance of the evidence that the statement was not testimonial (*United States v. Jackson, supra,* 636 F.3d at p. 695), and they did not meet this burden.

We observe that if defendant had been on trial for the November 2008 robbery of the drug dealer and the provocative act murder of Delonie, the admission of Perez's out-of-court statement as substantive evidence of its truth in the prosecution's case-in-chief would have constituted clear *Aranda/Bruton* error. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.) *Aranda* and *Bruton* "stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" (*People v. Jennings, supra,* 50 Cal.4th at p. 652; *Williams, supra,* 132 S.Ct. at p. 2256 (conc. opn. of Thomas, J.).) This underscores the powerfully incriminating and generally unreliable nature of Perez's out-of-court statement implicating defendant as having directed the November 2008 robbery.

Defendant admitted he was in possession of methamphetamine at the time of his arrest. He testified that the small bag of methamphetamine found in his coin pocket was for his personal use, and he possessed *that* methamphetamine before Ramirez came to his house. He also admitted he accepted another bag of methamphetamine from Ramirez in his garage shortly before his arrest. Given these admissions, Perez's testimonial hearsay statement that defendant directed the November 2008 gang-related robbery could not have affected the verdict on the possession charge.

Regarding the active gang participation charge, the jury was instructed pursuant to CALCRIM No. 1400 that active gang participation has three elements: (1) active participation in a criminal street gang in a sense that is more than nominal or passive; (2) with knowledge that members of the gang engage or have engaged in a pattern of criminal gang activity; and (3) willful promotion, furtherance of, or assistance in any felonious criminal conduct by a member of the gang. (§ 186.22, subd. (a); *People v. Johnson* (2013) 57 Cal.4th 250, 259.)

The first element—active participation—is shown if the defendant had *more than nominal or passive involvement* with the gang *at or near the time* he is charged with the offense of active gang participation. (*People v. Castenada* (2000) 23 Cal.4th 743, 747 (*Castenada*) ["The usual and ordinary meaning of 'actively' is 'being in a state of action; not passive or quiescent'"]; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509 ["It is not enough that a defendant have actively participated in a criminal street gang at any

58

point in time . . . . A defendant's active participation must be shown at or reasonably near the time of the crime."].)[12]

Castenada indicates that active involvement in a gang may be shown by the same evidence that supports the third element of the offense, that is, by the defendant's willful promotion, furtherance of, or assistance in any felonious criminal conduct by a member of the gang. The court said: "By linking criminal liability to a defendant's criminal conduct in furtherance of a street gang, section 186.22[, subdivision] (a) reaches only those street gang participants whose gang involvement is, by definition, 'more than nominal or passive.'" (Castenada, supra, 23 Cal.4th at p. 752.)[13]

---

[12] "A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22[, subdivision] (a). (§ 186.22, subd. (i).)" (People v. Rodriguez (2012) 55 Cal.4th 1125, 1130.) On the other hand, gang membership alone is insufficient to satisfy the active participation element of the offense. (People v. Garcia, supra, 153 Cal.App.4th at p. 1509; Gardeley, supra, 14 Cal.4th at p. 623.) Nor is it necessary to show the defendant held a leadership position in the gang or devoted all or a substantial amount of his time to the gang to prove the active participation element. (Castenada, supra, 23 Cal.4th at pp. 745, 749-752 [rejecting due process/vagueness challenge to active participation element of § 186.22, subd. (a)].)

[13] The defendant in Castenada was convicted of active gang participation based on a robbery and an attempted robbery he committed with other gang members. (Castenada, supra, 23 Cal.4th at pp. 745-746.) For months before he committed these crimes, the defendant was seen in the company of known gang members and bragged to police officers about his gang association. He conceded his commission of the robbery and attempted robbery with other gang members promoted, furthered, or assisted felonious criminal conduct by gang members. (Id. at pp. 752-753; § 186.22, subd. (a) [third element].) Based on all of these facts, the court found that sufficient evidence supported the active participation element of the offense. (Castenada, supra, at p. 753; see also People v. Martinez (2008) 158 Cal.App.4th 1324, 1331 [defendant's gang tattoos and admission of gang membership at the time he committed a robbery with another gang member sufficient to support active gang participation element].)

Without question, Perez's testimonial hearsay statement that defendant directed the November 2008 robbery of a Victorville drug dealer by several ESV gang members was a powerful piece of evidence that strongly indicated defendant was an active participant in the ESV gang in November 2008 and only weeks later, on December 5, 2008, when he met with Ramirez in his garage. But the prosecution did not seek to prove the active gang participation charge based on the November 2008 robbery; it sought to prove the charge based on defendant's acceptance of a bag of methamphetamine from Ramirez on December 5, and his willful promotion of felonious criminal conduct, namely, methamphetamine possession, by Ramirez, whom defendant knew was a gang member.[14]

But regardless of the prosecution's theory of the case, or trial strategy, was the verdict on the active gang participation charge "surely unattributable" to Perez's statement? (*Sullivan v. Louisiana, supra,* 508 U.S. at p. 279.) On this record, we are convinced beyond a reasonable doubt that the jury would have found defendant guilty of the active gang participation charge if it hadn't heard Perez's statement.

---

[14] CALCRIM No 1400 instructed the jury that the People had to prove defendant "willfully assisted, furthered, or promoted felonious criminal conduct" by members of the ESV gang by (a) directly and actively committing a felony offense or (b) aiding and abetting a felony offense. "Felonious criminal conduct" was defined as "possession of a [c]ontrolled [s]ubstance," and the jury was also instructed that "someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

During deliberations the jury sent a note to the court asking: "Are we basing the active gang participation . . . only on the crime committed on Dec[ember] 5, 2008[?]" In response the court instructed the jury: "Active participation could be any felonious conduct on or about Dec[ember] 5, 2008." Jurors are presumed to understand and follow the court's instructions (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005), and nothing in the record indicates the jurors did not follow this instruction. Presumably then, the jurors disregarded defendant's involvement in the November 2008 robbery in considering the active gang participation charge.

Furthermore, uncontroverted evidence proved the active gang participation charge independently of Perez's statement. According to Deputy Conley, Ramirez was an ESV gang member, and defendant did not deny knowing Ramirez was an ESV gang member when he testified in his own defense. Defendant admitted he willingly accepted a bag of methamphetamine from Ramirez and saw that Ramirez had a larger and several smaller bags of methamphetamine with him. Ramirez testified he was selling the drug; he divided a larger bag of the drug into smaller bags in the presence of defendant; and he gave defendant some "crumbs" of the drug. The jury also heard that Ramirez pled guilty to methamphetamine possession and active gang participation based on the December 5 incident in defendant's garage. And finally, defendant testified that he was aware of the ESV's criminal activities: he was one of the founding members of the ESV, younger ESV gang members sought his advice because he had "experience" and looked up to him

61

with "a great deal of respect" because he "followed the rules" and did not "snitch" on people.

Thus, defendant's testimony unequivocally showed that when he accepted a bag of methamphetamine from Ramirez, he willfully promoted, furthered, or assisted Ramirez, whom he knew to be an ESV gang member, in committing felonious criminal conduct, namely, methamphetamine possession, with knowledge that ESV gang members had engaged in a pattern of criminal gang activity. (§ 186.22, subd. (a).) The active participation element was satisfied by defendant's willing acceptance of methamphetamine from Ramirez. And as discussed, the jury was instructed not to consider and presumably did not consider any felonies committed before December 5 in considering the active gang participation charge—including defendant's direction of the November 2008 robbery by ESV gang members.

### III. DEFENDANT'S OTHER CLAIMS OF ERROR

A. *The "Felonious Criminal Conduct" Was Not Required to be Gang Related*

Defendant next claims insufficient evidence supports his active gang participation conviction because there is no evidence he promoted, furthered, or assisted a member of the gang in committing a *gang-related* felony or *gang-related* felonious criminal conduct. This argument is moot because, in December 2010, after the parties filed their original briefs on appeal, the California Supreme Court ruled that there is no requirement that the

62

"felonious criminal conduct" described in section 186.22, subdivision (a) must be "gang related." (*People v. Albillar* (2010) 51 Cal.4th 47, 59.)[15]

The high court explained that the plain language of section 186.22, subdivision (a) "targets felonious criminal conduct, not felonious gang-related conduct," and there is no "unwritten requirement" that the felonious criminal conduct that the defendant promoted, furthered or assisted must be gang related. (*People v. Albillar, supra,* 51 Cal.4th at pp. 51, 55.) This literal interpretation of the statute will not yield absurd results because "there is nothing absurd in targeting the scourge of gang members committing *any* crimes together and not merely those that are gang related. Gang members tend to protect and avenge their associates. Crimes committed by gang members, whether or not they are gang related or committed for the benefit of the gang, thus pose dangers to the public and difficulties for law enforcement not generally present when a crime is committed by someone with no gang affiliation. . . ." (*Id*. at p. 55.)

B. *The Trial Court's Two Minor Ex Parte Communications to the Jury Were Harmless Beyond a Reasonable Doubt*

The jury sent two notes to the court shortly after it began deliberating. One asked for a readback of defense counsel's closing argument, and the other stated: "Need a

---

**15** Section 186.22, subdivision (a) states: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists *in any felonious criminal conduct* by members of that gang, shall be punished . . . ." (Italics added.)

reading of the 602 what was it filled out for Fred Archuleta." The court called the counsel into the courtroom and advised them it had received the two notes.

Regarding the first note, the court said it had already sent the jury a return note stating that arguments of counsel were not evidence and would not be reread. Regarding the "602" note, the court advised counsel that the pertinent testimony had already been reread. Defense counsel objected to the court's refusal to order a readback of his closing argument, but he did not object to the court's "ex parte" order to have the 602 evidence reread. Defendant claims the court's ex parte communications to the jury in response to both notes violated section 1138,[16] and also constituted a prejudicial violation of his right to counsel. We find no prejudicial error.

1. The "602" Note and Readback

We first observe that defendant has forfeited his claims regarding the court's ex parte communication or ordered readback in response to the jury's 602 note, because he did not object to that communication or move for a mistrial based on it after he was informed it had occurred. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048 ["A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response."].)

---

[16] Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

64

In any event, the court's ex parte communication concerning the 602 note was harmless beyond a reasonable doubt; reversal, therefore, is not required. (*People v. Jennings* (1991) 53 Cal.3d 334, 383-384 [court's unauthorized ex parte communication with jury does not result in reversal if the improper contact was harmless beyond a reasonable doubt]; *People v. Delgado* (1993) 5 Cal.4th 312, 330.)

As explained in *People v. Wright* (1990) 52 Cal.3d 367, 402 and 403: "It is well settled that the trial court should not entertain, let alone initiate, communications with individual jurors except in open court, with prior notification to counsel. [Citation.] 'This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case. [Citations.]' [Citation.]

". . . '[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The . . . conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.' [Citation.] Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial, and thus constitute federal constitutional error, reversal is not required where the error can be demonstrated harmless beyond a reasonable doubt. [Citations.]"

65

Though the record does not indicate exactly what evidence was reread or provided to the jury in response to the 602 note, the readback took all of two minutes, from 3:58 p.m. to 4:00 p.m. on May 28. We are satisfied that this two-minute readback could only have consisted of one thing: two pages of defendant's direct testimony concerning a 602 filing. The contents of that portion of defendant's testimony can be briefly summarized.

When asked whether he recalled objecting to a notation on the 2008 classification sheet indicating his moniker was "Payaso," defendant said he "filed a 602 on this Payaso and Joker thing" when he was in state prison. He explained that "a 602" is "an appeal process" that inmates use if they feel unjustly accused of something in state prison. Around 1998, defendant discovered that another inmate had provided confidential information that Payaso, or defendant, was a Mexican Mafia associate. Defendant said he was known as "Joker," but had never been known as Payaso, so he "filed a 602" to correct or contest the allegation that he was known as Payaso, and "beat" the allegation. No 602 document was identified during trial or admitted into evidence.

Though we agree that the court should have deferred ordering the readback until after it conferred with counsel (*People v. Jennings, supra,* 53 Cal.3d at p. 384; § 1138), we find the error harmless beyond a reasonable doubt for three reasons. First, there is no indication that the readback contained any misstatement of the law. (Cf. *People v. Delgado, supra,* 5 Cal.4th at p. 331; *People v. Jennings, supra,* at pp. 384-385.)

Second, the court promptly advised counsel of the readback at 4:23 p.m., less than 25 minutes after the 3:58 p.m. to 4:00 p.m. readback occurred. The court recessed at 4:27

66

p.m., and the jury continued deliberating through the entire next day, May 29, and reached its verdicts on the following court day, June 1, after deliberating from 8:30 a.m. to 10:00 a.m. Defense counsel had plenty of time to inquire of the court concerning the 602 readback, and ask that the court correct, supplement, or otherwise modify the readback before jury deliberations concluded, if he felt the readback was somehow in error.

Third, defendant fails to articulate what might have happened had his counsel been advised of the readback in advance. (*People v. Delgado, supra,* 5 Cal.4th at p. 331.) During the remainder of its deliberations, the jury had no questions concerning its 602 note or the readback in response to it. Nor did the jury ask any other questions concerning the 602 filing.

"[I]t is questionable 'whether a defendant should be permitted to sit back, await a jury verdict, and then assert error based on the court's improper communication with the jury' [citation], at least when the improper communication was relatively minor." (*People v. Jennings, supra,* 53 Cal.3d at p. 384.) The 602 readback and the court's ex parte order concerning it was minor in the context of the entire trial, and for the reasons explained was harmless beyond a reasonable doubt.

2. The Request to Read Back Defense Counsel's Argument

In response to the jury's note requesting a readback of defense counsel's closing argument, the court returned the jury's note after writing on it: "Sorry, the arguments of counsel are not evidence and will not be provided to you." Defendant claims this ex

67

parte communication also violated section 1138 and his right to counsel.  Here, too, we find no prejudicial error.

The court's statement that "arguments of counsel are not [in] evidence" was a correct statement of the law (Evid. Code, § 140), and the court did not tell the jury to disregard the arguments of either side (see *People v. Gurule* (2002) 28 Cal.4th 557, 649 [a criminal defendant has a state and federal constitutional right to present closing argument to the jury]).

Further, the instructions told the jury that the opening statements, questions, and closing arguments of counsel were not evidence, and to base their decisions solely on the evidence.  (CALCRIM No. 222.)  In view of these factors and the record as a whole, the court's failure to confer with counsel before responding to the note was harmless beyond a reasonable doubt.  (*People v. Wright, supra,* 52 Cal.3d at pp. 402-403.)

C. *The Trial Court Did Not Abuse Its Discretion in Refusing the Jury's Request for a Rereading of Defense Counsel's Closing Argument*

Defendant claims the court did not understand that it had discretion to order the readback of defense counsel's argument, and in any event abused its discretion in refusing to order the readback.  We disagree.  The court both understood that it had discretion to order the readback, and properly refused to exercise it.

After the court told counsel it had refused the jury's request for a readback of defense counsel's closing argument, defense counsel objected and the court invited counsel to direct the court's attention to some authority that it had discretion to order the

68

readback.  The following morning, at least one full day before the jury concluded its deliberations, defense counsel directed the court's attention to *People v. Gordon* (1990) 50 Cal.3d 1223 (*Gordon*).

*Gordon* and subsequent cases have made it clear that while section 1138 requires the trial court to reread evidence and instructions upon the jury's request, the statute does not extend to arguments of counsel.  (*Gordon, supra*, 50 Cal.3d at pp. 1259-1260; *People v. Pride* (1992) 3 Cal.4th 195, 266; *People v. Gurule, supra,* 28 Cal.4th at p. 649.)  Still, a court has *inherent* authority and discretion to reread arguments of counsel upon request.  (*Gordon, supra,* at p. 1260; *People v. Sims* (1993) 5 Cal.4th 405, 453.)

Defense counsel pointed out that, while the trial court in *Gordon* also declined to reread defense counsel's argument, that court also told the jury it did not "'mean to . . . imply'" that the arguments of either side should be disregarded, but it was not appropriate for the court to "'emphasize one argument.'"  (*Gordon, supra,* 50 Cal.3d at p. 1259.)  Defense counsel next asked the court to tell the jury it should not disregard the arguments of either side, if the court was not inclined to order defense counsel's argument reread.

Following this discussion, the court did not order the readback and did not admonish the jury not to disregard either side's argument.  Without addressing why it was not ordering the readback, the court explained it was unnecessary to tell the jury not to disregard the arguments, because the instructions told the jury "what to do" with the arguments and the court never told the jury to disregard the arguments.  This was a proper exercise of the trial court's discretion.

The trial court in *Gordon* did not abuse its discretion in refusing to read back the defense counsel's argument, because it would have risked diverting the jury's attention from the evidence and the instructions. (*Gordon, supra,* 50 Cal.3d at p. 1260.) To be sure, a rereading of one argument but not the other generally risks placing undue emphasis on the reread argument at the expense of the evidence, the instructions, and the other side's argument.

In addition, and as the trial court pointed out, the instructions told the jury that the opening statements, questions, and closing arguments of counsel were not evidence, and to base their decisions solely on the evidence. (CALCRIM No. 222.) Nor did the trial court tell the jury to disregard the arguments. (See *People v. Gurule, supra,* 28 Cal.4th at p. 649 [a criminal defendant has "a state and federal constitutional right to present closing argument to the jury"].) There was therefore no need to tell the jury *not to* disregard the arguments.

Further, a court's refusal to reread an argument, if erroneous, is not prejudicial unless it is reasonably probable the jury would have reached a different result had the argument been reread. (*People v. Sims, supra,* 5 Cal.4th at p. 453; *People v. Watson* (1956) 46 Cal.2d 818, 836.) That is not the case here. Defense counsel's argument was not so complex that its repetition was necessary for defendant to receive the full benefit

of the adversarial process.  (*People v. Sims, supra,* at p. 453.)  Also, the disputed issues addressed in the argument were fully covered in the instructions.  (*Ibid*.)[17]

## IV.  DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

KING _____

J.

I concur:

MILLER _____

      J.

---

[17] The key points of defense counsel's argument were the following:  On count 1, counsel urged the jury to conclude that defendant did not possess the bag of methamphetamine that Ramirez gave him, because he never exercised control over it, though he knew it contained methamphetamine.  He also argued that the methamphetamine found on defendant was not a usable quantity, an essential element of the possession charge.

Regarding count 2, counsel reminded the jury that during opening statement he told them defendant "*was* a member" of ESV when it was known as the "VVR," and defendant "told the truth" about the gang's history.  He argued defendant was not a "shot caller" for the gang, though he mentored the gang's younger members about prison life and had no control over what the gang members did.  In short, counsel argued defendant was not an "active participant" in the gang and had not been since he was a teenager.

Counsel also argued that defendant did not assist, promote, further, or facilitate any felonious conduct on the part of Ramirez or any other gang members.  Ramirez was already in possession of the methamphetamine when he arrived at defendant's house, and there was no evidence the two men were planning a robbery or any other crime.  They never even had a chance to talk about the stolen car Ramirez was driving.

Lastly, counsel argued defendant had no incentive to possess methamphetamine or actively participate in a gang because he was a three striker.  Also, there was nothing defendant could do about the jail's classification of him as a gang member or the CDCR's validation of him as a Mexican Mafia associate.  Defendant contested the CDCR's validation through the 602 he filed.  The prosecution's case was built on circumstantial evidence, and it was more reasonable to conclude defendant was innocent rather than guilty.

[People v. Archuleta – E049095]

RICHLI, J.

I concur in the judgment.

I also concur that, even assuming the admission of Fernando Perez's out-of-court statement violated the confrontation clause, the error was harmless beyond a reasonable doubt. (Maj. opn. part II.C.3, pp. 57-62.) Accordingly, I see no need to address the relatively difficult and unsettled questions of whether Perez's statement was (1) testimonial (especially as it was evidently made during the investigation of a crime other than the one charged in this case) (Maj. opn. part II.C.2, pp. 53-57) or (2) offered for its truth (Maj. opn. part II.C.1, pp. 44-53), and I express no opinion on these points.

RICHLI_____
Acting P. J.

1